UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-81903-CIV-MARRA/MATTHEWMAN

TMJ PRACTICE MANAGEMENT
ASSOCIATES, INC., d/b/a NIERMAN
PRACTICE MANAGEMENT,

 Plaintiff,
vs.

RANDALL CURRAN, DEBBIE RUKA,
MELISSA KOGER, MONIQUE LOERA,
and STACI CRUM,

 Defendants.
_____/

## ORDER AND OPINION ON MOTION TO DISMISS OR TRANSFER

**THIS CAUSE** is before the Court upon Defendants' Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Transfer the Action to the Central District of California [DE 14]. The Court has carefully considered the entire Court file and is otherwise fully advised in the premises.

**A.** **Background**

Plaintiff TMJ Practice Management Associates, Inc. d/b/a Nierman Practice Management ("NPM"), has brought a seven-count Complaint (DE 1) against defendants Randall Curran ("Curran"), Debra Ruka ("Ruka"), Melissa Koger ("Koger"), Monique Loera ("Loera") and Staci Crum ("Crum") (collectively, "Defendants"). All Defendants live, work and reside in California. Compl. ¶¶ 2-6, 35.

Plaintiff asserts claims for Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act of 2016 (all Defendants) (Count One), Misappropriation of Trade Secrets Under Florida's Uniform Trade Secrets Act (all Defendants) (Count Two), Breach of Contract (Curran) (Count Three), Breach of Contract (Ruka, Koger, Loera, and Crum) (Count Four), Deceptive and Unfair Business Practices (all Defendants) (Count Five), Conspiracy to Violate the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Florida Statute 501.201 *et seq.* (all Defendants) (Count Six), and Common Law Unfair Competition (all Defendants) (Count Seven).

Defendants move to dismiss the complaint for improper venue pursuant to Fed. R. Civ. P. 12(b)(3), and for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). Alternatively, Defendants move to transfer the action to the Central District of California. In support, each Defendant has submitted an affidavit to controvert the personal jurisdiction allegations made in the Complaint. DE 14, Exhibits A through E. Based on this evidence, Defendants assert that venue in this judicial district is improper and this action must be dismissed or transferred to the Central District of California. Defendants also argue that this action should be dismissed or transferred to the Central District of California based on the doctrine of *forum non conveniens*; and that because they have no contacts in Florida, this Court should not exercise personal jurisdiction under the Florida long-arm statute. NPM responds that venue and personal jurisdiction are proper here and submits the declarations of Rose Nierman (owner of NPM), Courtney Snow, and Amber Achilles in support.

B.      **Underlying Factual Allegations**

Plaintiff NPM alleges that it is a Florida corporation with its principal place of business in West Palm Beach, Florida. Compl. ¶¶ 1, 11. The sole owner and shareholder of NPM is Rose Nierman ("Nierman"), a Florida resident. With a mission to guide and assist dentists through the insurance reimbursement process, NPM is the owner of the proprietary DentalWriter™ ("DentalWriter") Software, "which is the industry standard system for streamlining protocols, generating documentation, and billing medical insurance for dental sleep medicine, TMJ disorder treatment, and oral surgery." Compl. ¶ 20; Declaration of Rose Nierman ("Nierman Decl."), ¶ 2. NPM provides services such as continuing education, software and medical billing solutions, and support and training. Nierman Decl. ¶ 4. NPM is also the owner of CrossCode and CrossCode Online, a desktop program that allows subscribers to its services access to the right codes and exemplars for medical billing for TMJ and related services as well as providing access to the DentalWriter Software. Compl. ¶ 21.

NPM markets and sells its products primarily through its direct sales force. Compl. ¶ 22. NPM's success is dependent, in part, on its ability to protect its proprietary customer information (both current and prospective), National Provider Identifiers ("NPI") used to identify doctors for billing purposes, the tax ID number of the doctors used for billing purposes, as well as all of the billing information for each doctor and their practice. NPM relies on a combination of copyright, trademark and trade secret laws, as well as confidentiality agreements and sales and licensing

arrangements, to establish and protect its proprietary rights.  Compl. ¶ 23.

According to NPM, the value of this proprietary information to it cannot be overstated.  NPM spent many years and incurred substantial expense to both develop this proprietary information and safeguard it from competitors.  In a highly competitive market, Plaintiff's trade secret information such as its business plans, customer names, contact information, and needs of current and prospective customers, financial data, training manuals, educational materials, and seminar related information gives NPM a continuing competitive advantage.  This information is not generally known and would be extremely difficult, if not impossible, to duplicate.  Compl. ¶ 24.

NPM's employees are required to execute confidentiality agreements by which they agree to protect NPM's proprietary information, acknowledge that the information is the sole property of NPM, and agree to return any such information upon termination of their employment with NPM.  Compl. ¶ 24.

Curran was an employee of NPM.  He was hired on May 12, 2014, as the Director of DentalWriter Medical Billing Services.  Compl. ¶ 26.  Curran executed an NPM Employee Confidentiality Agreement ("Curran Confidentiality Agreement") on May 12, 2014.  A copy of Curran's Confidentiality Agreement is attached to the Complaint as Exhibit A.  Compl. ¶ 28.  The Curran Confidentiality Agreement provides that "Confidential and Proprietary Information" shall not be used by the employee for any purpose except as necessary to perform his services for Plaintiff.  Compl. ¶ 28.

The Curran Confidentiality Agreement also contains a Non-Solicitation provision, and a detailed Non-Compete provision.  Compl. ¶¶ 29, 30.

Curran also executed a Confidentiality/HIPAA Agreement ("Confidentiality/HIPAA Agreement") on May 12, 2014.  A copy of the Confidentiality/HIPAA Agreement is attached to the Complaint as Exhibit B.  Compl. ¶ 31.  The Confidentiality/HIPAA Agreement required Curran to surrender all NPM records at the end of his employment and prohibited his use of NPM's client information and related documents.  Compl. ¶ 32.  As an employee of NPM, Curran had access to NPM's confidential and proprietary information, including but not limited to customer lists, National Provider Identifiers used to identify doctors for billing purposes, the tax ID number of the doctors also used for billing purposes, as well as all of the billing information for each doctor and their practice, including the status of pending billing claims processing for each of the respective doctors, and the business and marketing plans of NPM and pricing related information.  Compl. ¶ 33.

Defendants Ruka, Koger, Loera, and Crum (hereafter "Account Managers") were each employed by NPM as Account Managers in California.  As such, they had direct access to NPM's customers and customer contact personnel as well as oversaw all activities with respect to those customers within their assigned area.  Compl. ¶ 35.  Each of the Account Manager defendants agreed to and signed a Confidentiality/HIPAA Agreement which expressly stated their obligations during and after employment.  Compl. ¶ 36.  These agreements are not attached to the Complaint and

each of the Account Managers has declared that they do not recall ever signing any such agreement and therefore believes they did not sign such an agreement. DE 20-2, 20-3, 20-4, 20-5. As Account Managers, these defendants had access to NPM's confidential and proprietary information, including but not limited to customer lists, National Provider Identifiers used to identify doctors for billing purposes, the tax ID number of the doctors also used for billing purposes, as well as all of the billing information for each doctor and their practice, including the status of pending claims submitted by NPM on behalf of the respective doctors. Compl. ¶ 37.

Curran began plotting the start-up of a business to compete with NPM prior to April, 2016. Compl. ¶ 38. By April, 2016, Curran was telling employees about his plans to open his own company and take the employees of NPM as well as its clients. Compl. ¶ 39. Between June 11, 2016 and September 2, 2016, while employed by NPM, Curran and the Account Managers developed the competing business, Pristine Medical Billing, and solicited then current employees of NPM to leave NPM and go to work with them. Compl. ¶ 43. During this same time period, Curran, as well as the Account Managers, told customers and employees of NPM that its medical billing offices in California would be closing and "shutting its doors." Compl. ¶ 44. On August 20, 2016, Curran gave his two weeks' notice to Nierman. Compl. ¶¶ 46, 49. On August 22, 2016, Curran already had the website for Pristine Medical Billing registered and online, with Curran as the CEO/Founder. Compl. ¶ 50.

Although they had already agreed with Curran that they were leaving NPM to go

work with Curran at Pristine, Ruka, Koger, Loera, and Crum were instructed by Curran and agreed to hold off on sending their resignation letters until after a meeting with NPM that was scheduled as a result of Curran's notice that he was leaving.  Compl. ¶ 52.

Before leaving NPM, Curran and the Account Managers, without authorization, downloaded, copied or otherwise arranged for the transfer of NPM data to Pristine so they could follow-up on claims already filed by NPM on behalf of its clients and also continue to bill NPM's clients through Pristine.  Compl. ¶ 52.  Before leaving NPM, Curran and the Account Managers destroyed NPM data and covered up leads that had come in to NPM that were being diverted to Pristine.  Compl. ¶ 53.  Before leaving NPM, Curran and/or Ruka destroyed Ruka's employee file which contained her executed Confidentiality Agreement and signed acknowledgment of her receipt of and agreement to the NPM employee handbook's terms and conditions.  Compl. ¶ 54. Even after leaving, defendant Crum contacted NPM employees that did not leave in an attempt to access confidential billing information of at least one of the clients that they stole.  Compl. ¶ 55.

C.   Venue Standard

Defendants move to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3).  Section 1391 of Title 28 of the U.S. Code governs venue in federal civil actions.  Pursuant to § 1391(b), venue is proper in: (1) a judicial district in which any defendant resides, if all defendants are residents of the state in which

the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.  If venue is improper, the district court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).  The decision to transfer or dismiss is within the Court's discretion.  *Roofing v. Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc.*, 689 F.2d 982, 985 (11th Cir. 1982); *Brownsberger v. Nextera Energy, Inc.*, 436 F. App'x 953, at *1 (11th Cir. Aug. 5, 2011).

In evaluating a motion to dismiss for improper venue without a hearing, the Court determines whether Plaintiff has made "only a prima facie showing of venue." *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988), *cert. denied*, 494 U.S. 1081 (1990) ("*Delong Equip.*").  Further, "[t]he facts as alleged in the complaint are taken as true, to the extent they are uncontroverted by defendants' affidavits."  *Id.*; *see also Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1355 (11th Cir. 1990).  When there is a battle of affidavits placing different constructions on the facts, the Court "is inclined to give greater weight, in the context of a motion to dismiss, to the plaintiff's version, particularly when the jurisdictional questions are apparently intertwined with the merits of the case."

*Delong Equip.*, 840 F.2d at 845.  Finally, acknowledging that venue may be proper in two or more districts,[1] the Eleventh Circuit has stated that "only the events that directly give rise to a claim are relevant" and that "of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered."  *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003) (interpreting identical language from prior venue statute) ("*Jenkins*").  The Eleventh Circuit interpreted § 1391(a)(2)'s substantiality requirement narrowly: "[O]nly those acts and omissions that have a close nexus to the wrong" are relevant in the venue analysis.  *Jenkins,* 321 F.3d at 1372.  In conducting this analysis, "the proper focus of the venue inquiry is on the relevant activities of the Defendants."  *Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*, 669 F. Supp. 2d 1353, 1357 (S.D. Fla. 2009).[2]

---

[1] "A plaintiff is not required to select the venue with the most substantial nexus to the dispute; it must simply choose a venue where a substantial part of the events giving rise to the claim occurred."  *Azalp LLC v. Silverstein*, 2015 WL 12711232, at *5 (S.D. Fla. 2015) quoting *Gulf Power Co. v. Coalsales II, LLC*, 2008 WL 563484 (N.D. Fla. Feb.27, 2008) (internal quotations and citations omitted).

[2] Emphasizing the importance of focusing on the defendant's actions giving rise to the claim at issue when identifying the proper venue, the Eleventh Circuit has criticized a line of cases "epitomized" by the "'minimum contacts' personal jurisdiction" approach to venue under § 1391(b)(2) expressed in *United States Surgical Corp. v. Imagyn Med. Tech.*, 25 F. Supp. 2d 40, 45 (D. Conn. 1998).  *Jenkins*, 321 F.3d at 1372. In *U.S. Surgical Corp.*, the trial court found venue proper in the District of Connecticut under § 1391(b)(2) despite the fact that the California defendant performed and allegedly breached his employment contract in California.  *U.S. Surgical Corp.*, 25 F. Supp. 2d at 45.  In doing so, the Connecticut court relied on the fact that the contract at issue was negotiated and executed in Connecticut, and the defendant attended training classes and sales meetings in Connecticut.  *Id.*  The

**D.     Discussion**

Defendants move to dismiss the Complaint, or have this case transferred to the Central District of California, arguing that no substantial events or omissions that give rise to the claims in the Complaint occurred in the Southern District of Florida.[3],[4] NPM argues the exact opposite, and relies on the following allegations and declarations in support.[5]

---

Eleventh Circuit found this analysis to be "incorrect[,]" noting that "its flavor was that of a 'minimum contacts' personal jurisdiction analysis rather than a proper venue analysis." *Jenkins*, 321 F.3d at 1372.  Returning to the maxim that "[o]nly the events that directly give rise to a claim are relevant" in the venue analysis, the Eleventh Circuit expressed its disapproval of the notion that "a defendant's attendance at sales meetings is an 'event giving rise to a claim' for breach of a covenant not to compete."  *Id*. at 1371, 1372.  Thus, in accordance with Eleventh Circuit precedent, the Court must focus its venue analysis not on all aspects of the relationships between the parties, but on the location of the acts and omissions giving rise to the claims asserted, those actions with a close nexus to the wrong.

[3]     The Court notes that all Defendants aver that they never worked for NPM in Florida and have always worked exclusively in Riverside County, California.  *See* Declaration of Randall Curran, DE 14-1, ¶¶ 5-7; Declaration of Debbie Ruka, DE 14-2, ¶¶ 4-5; Declaration of Melissa Koger, DE 14-3, ¶¶ 4-5; Declaration of Monique Loera, DE 14-4, ¶¶ 4-5; Declaration of Staci Crum, DE 14-5, ¶¶ 4-5.  NPM does not counter these declarations, therefore they are accepted as true for purposes of the instant motion.

[4]     Defendants also argue dismissal or transfer is appropriate based upon the doctrine of *forum non conveniens*, that this Court does not have personal jurisdiction over Defendants under Florida's long-arm statute, or under Constitutional Due Process principles.  Because the Court finds that venue is not proper in the Southern District of Florida, it is not necessary to address the remaining arguments.

[5]     NPM withdraws any claim to venue premised on a contractual venue provision and asserts that its allegation made in paragraph 10 of the Complaint was a good faith mistake.  DE 17, n.5.

1. Defendants' copying and deletion of highly sensitive and confidential information from Plaintiff's customer database, located on servers at NPM's main office in Palm Beach County. Compl. ¶¶ 78, 84; Nierman Decl. ¶¶ 8-10, 19, 21, 24, 25-26, 29.

2. Defendants' breach of confidentiality agreements entered into with NPM, a Florida entity with its principal place of business in Palm Beach County, by failing to return to NPM its confidential or proprietary information. Compl. ¶¶ 25, 77, 79-80, 83-85; Nierman Decl. ¶¶ 7, 11, 15, 23, 28-29.

3. Defendants' solicitation of clients of NPM in Florida and elsewhere throughout the country, along with their solicitation of NPM employees in California, which tortious acts harmed NPM in Florida. Compl. ¶¶ 14, 60, 69; Nierman Decl. ¶¶ 27, 29-30, 32, Ex. A.

4. Defendant Curran's receipt of quarterly profit distributions from CrossCode Billing Services, LLC, a Florida limited liability company related to NPM with its principal place of business in Palm Beach County; payment for all Defendants' services by CrossCode. Nierman Decl. ¶¶ 6-7, 12; Curran Decl. ¶ 14.

5. Defendant Curran being employed by NPM as the Director of DentalWriter Medical Billing Services, and tasked with developing business of NPM in Florida and managing NPM's operations in Florida. Compl. ¶ 26; Nierman Decl. ¶ 12.

The allegations made in the five paragraphs above cannot be said to have a close nexus with the causes of action alleged in the Complaint. Keeping in mind that (1) only the events that directly give rise to a claim are relevant, and of the places where the events have taken place, (2) only those locations hosting a "substantial part" of the events are to be considered, the Court concludes that venue is not proper in the Southern District of Florida.

None of the alleged actions taken by any defendant appear to have been

initiated or taken in Florida, except for the allegation that Defendants' solicited clients of NPM in Florida (paragraph 3 above).  In her Declaration, Neirman avers that defendant Curran solicited at least two NPM Florida based clients, including Dr. David Yates of Palm Beach Gardens and Dr. Frank Giunta of Tampa.  DE 17-1, ¶ 27.  Curran responds that this assertion is false (Curran Supp. Decl. ¶ 7), however, Dr. Yates' office manager filed a declaration stating, "[p]rior to cancelling [NPM's] medical billing service while still a client of [NPM], our office was solicited by Randy Curran to switch our services over to Pristine Medical billing."  Declaration of Amber Achilles, DE 17-3, ¶ 5.  As NPM has countered Curran's responsive affidavit with an "reply" affidavit from one of NPM's actual clients attesting to the fact that Curran solicited their business, the Court accepts as true the allegation that Curran solicited two of NPM's clients in Florida.  This fact is an event the Court considers in its analysis.  This fact, in and of itself, however, is not substantial, especially when viewed in comparison to the other NPM clients Defendants are alleged to have contacted:  eight in California, and 16 in other states.  Nierman Decl. DE 17-1.

The allegation stated in paragraph 1 above asserts that Defendants copied and deleted information from NPM's home server located in Palm Beach County.  NPM asserts that Florida district courts have specifically recognized that venue is proper here when a plaintiff alleges that it suffered an injury in the state.  The cases cited by NPM to support this contention are unpersuasive because, among other reasons, these decisions do not consider the allegation that injury was suffered in the state as

the only factor in coming to their conclusion that venue was proper in the state.[6] Importantly, where the injury occurred is only one factor that may be considered when determining whether a substantial part of the events occurred at a certain location.  More importantly, the Court's focus must be on the relevant activities of the Defendants.  *Hemispherx*, 669 F. Supp. 2d at 1357.  The allegation that Defendants copied and deleted information from NPM's home server suggests that the alleged harm arose out of Defendants' activities in California, where they lived and worked.  In addition, Plaintiff's position has been rejected by at least one appeals court in the context of Lanham Act claims.  The Eighth Circuit has observed that "while damages or potential adverse economic effect are a necessary part of a Lanham Act claim, if Congress had wanted to lay venue where the plaintiff was residing when he was injured, it could have said so expressly."  *Woodke v. Dahm*, 70

---

[6] *Chapin Revenue Cycle Management, LLC v. JDA eHealth Systems, Inc.*, 2012 WL 469824, at *4 (M.D. Fla. 2012) (finding venue proper in the district where Plaintiffs were injured without analyzing where a substantial part of the events occurred); *Seminole Transp. Specialists, Inc. v. PDM Bridge, LLC*, 2009 WL 3822773, at *3 (M.D. Fla. 2009) (not holding that venue is proper where the plaintiff allegedly suffered an injury, merely finding that a substantial part of the events giving rise to the claims occurred in Florida); and *Capital Corp. Merchant Banking, Inc. v. Corporate Colocation, Inc.*, 2008 WL 4058014, at *3 (M.D. Fla. 2008) (noting the difficulty of conducting a venue analysis to a case where the "wrong," such as an online defamatory statement, does not center on physical acts or omissions and no one forum should be expected to stand out as a particularly strong candidate for venue, stating that courts under these circumstances generally conclude that venue under § 1391(a)(2) is proper in the district where the injured party resides *and* the defamatory statements were published.  (Emphasis added.)  The plaintiff alleged that its website was accessed in the Middle District of Florida, but it also alleged that it suffered harm to its reputation and economic injury in the Middle District).

F.3d 983, 985 (8th Cir. 1995) ("by referring to 'events or omissions giving rise to the claim,' Congress meant to require courts to focus on relevant activities of the defendant, not of the plaintiff.")  Thus, Plaintiff having suffered damages in Florida is insufficient, in and of itself, to establish that venue is proper within the Southern District of Florida.  *BPI Sports, LLC v. PHD Fitness LLC,* 2014 WL 11706458, at *3 (S.D. Fla. 2014).

The allegations in paragraph 2 above, failing to return confidential or proprietary information, is an omission which would have occurred in California, where all the Defendants worked.  Moreover, in Curran's Supplemental Declaration, he avers that he and the Account Manager defendants returned to Ms. Nierman in California, their laptop computers, client lists, and passwords to the web-based systems being used in California.  DE 20-1 at ¶ 3.

Paragraph 4 above alleges that Curran received quarterly profit distributions, and that all Defendants were paid by a Florida company.  These allegations are irrelevant to the instant inquiry because they have nothing to do with the claims of the Complaint.

Paragraph 5 above, addressing solely Curran, alleges that he was "tasked with developing business of NPM in Florida and managing NPM's operations in Florida."  These activities, which are contested, have an insubstantial connection with the kinds of events that give rise to the claims of the Complaint.  The allegations of paragraphs 4 and 5 above are relevant for an analysis of minimum contacts in relation to a

determination of personal jurisdiction rather than to a proper venue analysis. *Bremer*, 321 F.3d at 1372. The venue analysis under § 1391(b)(2) generally requires a greater level of relevant activities by the Defendants than the minimum contacts analysis for personal jurisdiction. *Id*.

In examining the substantial part of the events or omissions alleged, the relevant activities of Defendants occurred in California, not Florida. Viewing the overall nature of NPM's claims and the nature of the specific events or omissions in the forum, the Court cannot conclude that a substantial part of the events or omissions giving rise to NPM's claims occurred in the Southern District of Florida. The best that can be said is that defendant Curran is alleged to have contacted two clients of Plaintiff in the state of Florida, compared to 24 clients in other states, and that the activities of Defendants outside the state of Florida are alleged to have caused injuries to a Florida company in Florida. While this may support personal jurisdiction, the material acts or omissions within the Southern District of Florida does not bear a sufficiently close nexus to the asserted wrongs. Despite evidence that a few events relevant to the causes of action asserted in the Complaint occurred in Florida, overall, these events do not rise to the level of "a substantial part of the events or omissions giving rise to the claim." 28 U.S.C. § 1391((b)(2). Accordingly, venue in the Southern District of Florida is therefore improper.

E.      **Plaintiff's Case Will be Transferred, Not Dismissed**

The cure of defects in venue is governed by 28 U.S.C.§ 1406(a), which provides

that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The interests of justice generally favor transferring a case to the appropriate judicial district rather than dismissing it. *Hemispherx Biopharma,* 669 F. Supp. 2d at 1359. "The decision whether to transfer a case is left to the sound discretion of the district court and is reviewable only for an abuse of that discretion."
*Roofing & Sheet Metal Services, Inc. v. La Quinta Motor Inns, Inc.,* 689 F.2d 982, 985 (11th Cir. 1982).

Here, the Court finds that the interests of justice would best be served by transferring this case to the Central District of California, the district where all Defendants reside. Based on the foregoing, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Transfer the Action to the Central District of California [DE 14] is granted in part and denied in part.

2. The Clerk is directed to TRANSFER this case to the District Court for the Central District of California; and

3. The Clerk is directed to CLOSE this case and DENY any pending motions

as MOOT.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 23rd day of July, 2017.

_____
KENNETH A. MARRA
United States District Judge